**CROWN CENTRAL PETROLEUM CORPORATION, Plaintiff,**

v.

**Thomas S. KLEPPE, United States Secretary of the Interior and Edward E. Shelton, Director of Office for Equal Employment Opportunity for U. S. Department of the Interior, Defendants.**

**Civ. A. No. M–76–1170.**

United States District Court,
D. Maryland.

Nov. 24, 1976.

Donald F. Burke, John S. McDaniel, Jr., Charles E. Partridge, Jr., and Cable, McDaniel, Bowie & Bond, Baltimore, Md., for plaintiff.

Jervis S. Finney, U.S. Atty., and Robert P. Trout, Asst. U.S. Atty., Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

Plaintiff, Crown Central Petroleum Corporation, seeks to prevent defendants, Kleppe[1] and Shelton,[2] from disclosing to a third person[3] the Standard Form 100, Employer Information Report EEO–1 (hereinafter EEO–1), which the plaintiff filed through the Joint Reporting Committee[4] on June 16, 1975.

This court has jurisdiction under 28 U.S.C. § 1331. *Westinghouse Electric Corp. v. Schlesinger*, 542 F.2d 1190 (4th Cir. 1976).

### Facts

Plaintiff, Crown Central Petroleum Corporation (Crown Central), is a Maryland corporation engaged in the producing, refining, and marketing of petroleum products and petrochemicals. Crown Central now holds eight leases with the Department of Interior for oil and gas rights on certain tracts lying in the continental shelf. These leases, granted under the authority of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., convey to Crown Central and other petroleum companies jointly a property interest in oil and gas deposits beneath the continental shelf. One of the leases (No. OCS–G–1773) became effective July 1, 1968. Six of the leases (OCS–G–2821, OCS–G–2825, OCS–G–2865, OCS–G–2874, OCS–G–2892, OCS–G–2922) became effective December 1, 1974. The final lease (OCS–G–3119) became effective July 1, 1975. Section 2(a) of each of the leases calls for the lessees to pay rental each year and to pay royalties. Crown Central's share of each of the eight leases is valued at more than $50,000.

On July 14, 1976, the Office for Equal Employment Opportunity, Department of the Interior (Office) received a request from the Mexican American Legal Defense and Educational Fund for the release of various documents under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Among the documents requested was a copy of the latest EEO–1 report for Crown Central's Pasadena, Texas facility.

The Form EEO–1 affords the opportunity for reporting firms to indicate whether such reports are filed pursuant to EEOC or OFCC requirements, or both. In the case of plaintiff's 1975 Form EEO–1, plaintiff indicated in Section C 3 of the Form that it was not a "government contractor" and did not have any of the other federal relationships listed therein.

On July 20, 1976, the Office advised Crown Central of the FOIA request and requested that its views on disclosure be submitted no later than July 23, 1976. By letter dated July 22, 1976, counsel for

---

1. Secretary of the Interior.

2. Director, Office for Equal Employment Opportunity for Department of Interior (Office).

3. The third person has not sought to intervene here.

4. The Joint Reporting Committee was established to receive the reports that must be filed with (1) the EEOC pursuant to 42 U.S.C. § 2000e–8(c) and (2) the Office of Federal Contract Compliance (OFCC) of the U.S. Department of Labor pursuant to Executive Order 11246, as amended, 3 C.F.R. 169 et seq. and regulations of the Department of Labor promulgated pursuant thereto which are codified at 41 C.F.R. Part 60–1. In Brief, 42 U.S.C. § 2000e–8(c) requires employers and others subject to Title VII of the Civil Rights Act of 1964 to file reports with the EEOC while Executive Order 11246, in relevant part, requires a business having a contract with a Government contracting agency to file reports with the contracting agency or the OFCC.

Crown Central, Mr. Donald F. Burke, informed the Office of Crown Central's objection to the release of any part of the EEO–1 report. On July 28, 1976, the Office informed the Mexican American Legal Defense and Educational Fund by letter that the Crown Central information it requested was within the scope of the disclosure provisions of the FOIA. On August 10, 1976, Crown Central filed a Verified Complaint in this court challenging the disclosure of the information requested by the Mexican American Legal Defense and Educational Fund. After the expiration of the initial Temporary Restraining Order, to which the Government consented, the parties stipulated that the material would not be released until the court entered judgment authorizing release or until after October 29, 1976, whichever occurred first. The court, after argument, entered a preliminary injunction on October 29, 1976, in order to allow it sufficient time to consider the merits of the issues here presented.

Plaintiff first argues that the 1975 EEO–1 information was not obtained by the office under authority of Executive Order 11246, and that, therefore, the information may not be disclosed in reliance on Executive Order 11246.

Second, plaintiff asserts that its 1975 EEO–1 form is exempted from the FOIA by 5 U.S.C. § 552(b)(3) in conjunction with 42 U.S.C. § 2000e–8(e), or 18 U.S.C. § 1905, or 44 U.S.C. § 3508.

I. *Information Obtained Under Executive Order 11246, 3 C.F.R. 169*

Plaintiff argues that the Department of Interior does not have jurisdiction over plaintiff under Executive Order 11246 in order to compel disclosure of the information in the 1975 EEO–1 form.

Plaintiff asserts that it is not a "government contractor"[5] within the meaning of Executive Order 11246 and the OFCC regulations.[6] In the alternative, plaintiff argues that if it is a "government contractor" within the meaning of Executive Order 11246, or the OFCC regulations, then the Executive Order has exceeded the authority delegated to the President under the relevant statutes.

A. *Meaning of "Government Contractor" under Executive Order 11246 or under OFCC Regulations*

Plaintiff's contention is that the relationship between itself and the Government is that of a lessor-lessee, in which the financial benefit (cash flow) is toward the Government, rather than a private contractor-consumer relationship where the cash flow is toward the private contractor.

*Executive Order 11246*

The Executive Order does not itself define "Government contract." It does, however, purport to be broad in the sweep of its application. Section 202 of Executive Order 11246 provides that with the exception of certain types of contracts defined in Section 204 which are not here relevant, ". . . *all* Government contracting agencies shall include in *every* Government contract . . ." requirements that the contractor not discriminate in employment ". . . because of race, color, religion, sex, or national origin." (Emphasis supplied). Section 203 provides that "*each* contractor having a contract containing the provisions prescribed in Section 202 shall file . . ." the reports here at issue. (Emphasis supplied). The literal language of the Executive Order does not betray any presidential intent that the order should be parsimoniously interpreted.

Under § 201 of Executive Order 11246, the Secretary of Labor is authorized to adopt such rules and regulations ". . . as he deems necessary and appropriate to achieve the purposes thereof." 3 C.F.R. at 170.

---

**5.** In *Westinghouse,* it was conceded that the parties were government contractors.

**6.** The Department of Labor Rules apply to all federal contracts including those of the Department of the Interior. *See* 41 C.F.R. § 60–1.1 (1975).

*Office of Federal Contract Compliance Rules 41 C.F.R. § 60–1 (1975)*

The OFCC, as delegate for the Secretary, has defined "government contract" as follows:

"*any* agreement or modification thereof between *any* contracting agency and *any* person for the furnishing of supplies or personal property including lease arrangements."

41 C.F.R. § 60–1.3(m) (Emphasis supplied). Here again, no restrictive language is evident betraying an intent to limit the application of the provision of the Executive Order to those circumstances in which the Government is a consumer of goods, services, or real property rather than a supplier.

 The national policy to eliminate racial and other discrimination in employment is of paramount priority. *See, e. g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). No logical reason has been advanced as to why the President would have intended to pursue that national policy by requiring the Executive Order to apply to employers which had contracted with the Government to supply it goods, services, and leased property for the use of the Government but not requiring the order to apply to employers which had contracted with the Government to receive from it goods, services, and leased property to be used by the employer. In the absence of a compelling reason for such a seemingly inconsistent application of national policy, this court will not adopt the plaintiff's suggested interpretation of Executive Order 11246.

#### Leases

The leases themselves to which the plaintiff is a party as a lessee clearly contemplate the applicability of Executive Order 11246.

7. An alternative holding was that the utility company sold enough electricity to the government to be subject to Executive Order 11246.

Particularly illuminating are paragraphs (4) and (5) of Section 2(k) in the leases:

"(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

"(5) The lessee will furnish all information and reports required by Executive Order No. 11246[8] of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

While there is no reported judicial decision on point, the defendants have directed the court's attention to an informal administrative interpretation by James D. Henry, Associate Solicitor, to George Travers, Acting Director of OFCC. (Defendants' Exhibit 3 to Paper 12). There the associate solicitor determined that the Navy's grant of a "License for Non-Federal Use of Real Property" to a utility company subjected the utility company to Executive Order 11246.[7]

Such an administrative interpretation of the Executive Order, consistent with the purpose of the Order, is entitled to great deference. *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Contractors Association of Eastern Pennsylvania v. Secretary of Labor*, 442 F.2d 159, 175 (3d Cir. 1971), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971).

#### Title 43, U.S.C.

Neither party has referred in argument to Title 43, but the court believes it pertinent.

The leases here were entered into under the authority of the Outer Continental Shelf Act, 43 U.S.C. §§ 1331–43. Under 43 U.S.C. § 1334(a)(1),[8] the Secretary of the

8. "§ 1334. *Administration of leasing—Rules and regulations; amendment; cooperation with*

Interior is authorized to prescribe rules regulating leases and resource development of lands of the type involved here. The rules thereunder specify that all oil leases shall be made on forms approved by the delegate of the Secretary of the Interior:

"§ 3302.6 Form.

Oil and gas leases and leases for sulphur will be issued on forms approved by the Director. Other mineral leases will be issued on such forms as may be prescribed by the Secretary."

43 C.F.R. § 3302.6 (1975).

As noted above, the leases to which plaintiff is a party expressly require compliance with Executive Order 11246.

Therefore, plaintiff's compliance with Executive Order 11246 is required under Title 43, U.S.C.

In summary, based upon the literal language of the pertinent Executive Order and Regulations, as well as upon the administrative interpretation given them, and the broad remedial purpose behind the Executive Order requiring a generous interpretation of its applicability, the court determines that plaintiff is a "Government contractor" under Executive Order 11246, 3 C.F.R. § 169, the rules thereunder, 41 C.F.R. § 60–1 (1975), and its own leases, §§ 2(k)(4) and (5).

**B. Authority of Executive Order 11246 to include oil leases within its term . "Government contract"**

Plaintiff argues that even if it is deemed a "Government contractor" under Executive Order 11246, the Order has exceeded the authority delegated to the President under the relevant statutes. Plaintiff states:

*State agencies; violations and penalties; compliance with regulations as condition of lease*
"(a)(1) The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper

"Executive Order 11246, and (sic) amended, and regulations thereunder are limited in scope and authority by the statutory provisions which are the basis of the Executive Order itself. There are two Congressional statutes which give the President the power to issue Executive Order 11246, as amended. These statutes appear in Title 40 and Title 41 of the U.S. Code. Title 40 deals with the management of government property and Title 41 concerns itself with contracts for the procurement of supplies and services to the government."

\* \* \* \* \* \*

"Title 41 pertains to federal procurement and supply of personal property and nonpersonal services. Therefore, what is involved under the Executive Order 11246, as amended, are contracts with the federal government for the procurement and supply of personal property and nonpersonal services. The phrase 'lease arrangements' as it appears in Section 60–1.3, Subparagraph (m) of the Department of Labor regulations thus relates to the leasing of personal or real property to the government in order for it to be within the Congressional limits and declared policy under which the Executive Order was issued."

It appears to the court that the plaintiff is too niggardly in reciting the basis in law for Executive Order 11246. The Order itself states that it is issued "[u]nder and by virtue of the authority vested in [the] President of the United States by the *Constitution and [S]tatutes* of the United States." (Emphasis supplied).

Article II, § 1 of the Constitution provides that "executive Power shall be vested in" the President. Such power gives

in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter."

\* \* \* \* \* \*

the President the right, in the absence of an express Congressional declaration to the contrary, to control the terms upon which public lands or property may be sold, leased, or used by private individuals or entities. *United States v. Midwest Oil Co.,* 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915). Assuming, without deciding, that neither Title 40 nor Title 41 purports to give the President the authority with reference to the oil leases here in question to promulgate Executive Order 11246, this court believes that the Constitution itself gives ample authority to the President to do so.

## II. *Exemption from FOIA under 5 U.S.C. § 552(b)*

Plaintiff argues that the information, which is requested under the Freedom of Information Act, is exempt from disclosure under the third Statutory exemption, 5 U.S.C. § 552(b):[9]

"(b) This section does not apply to matters that are—

\* \* \* \* \* \*

"(3) specifically exempted from disclosure by statute;

"(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential."

Plaintiff here urges only (b)(3), but (b)(4) is set out because of its role in *Westinghouse, supra.* Plaintiff argues alternatively that one of three statutes joins with exemption 3 to prevent disclosure here.

### A. *42 U.S.C. § 2000e–8(e)*

■ Section 709(e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–8(e) provides:

"It shall be unlawful for any officer or employee of the [Equal Employment Op-

portunity] Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of any proceeding under this subchapter involving such information. Any officer or employee of the Commission who shall make public in any manner whatever any information in violation of this subsection shall be guilty of a misdemeanor and upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than one year."

As demonstrated above, the information sought here was obtained under Executive Order 11246.[10]

Plaintiff's argument was discussed and rejected in *Westinghouse, supra,* and in *Sears, Roebuck and Co. v. General Services Administration,* 384 F.Supp. 996, 1002–03 (D.D.C.), *stay dissolved,* 166 U.S.App.D.C. 194, 509 F.2d 527 (1974).

The Fourth Circuit said:

"So far as a claim under § 709(e) is concerned, we are inclined to agree with the District Court that, despite the persuasiveness of the argument to the contrary, and the cogent reasoning advanced by Justice Douglas in his opinion disposing of a request for a stay in *Chamber of Commerce v. Legal Aid Society* (1975), 423 U.S. 1309, 96 S.Ct. 5, 46 L.Ed.2d 14, the information involved here cannot claim immunity under § 709(e) as a statute forbidding disclosure of the information in question in these actions."

*Westinghouse,* 542 F.2d at 1199.

As here, the information sought in *Westinghouse* included the EEO–1 form.

\* \* \* \* \* \*

---

**9.** The agency duty to disclose is stated in 5 U.S.C. § 552(a)(3):

"(a)(3) . . . [E]ach agency, on request for identifiable records made in accordance with published rules stating the time, place, fees to the extent authorized by statute, and procedure to be followed, shall make the records promptly available to any person. . . ."

**10.** Even if plaintiff thought it was supplying the information only under Title VII, its obligation under the lease and the Outer Continental Shelf Act would have been unfulfilled if it had not supplied the information.

## B. *44 U.S.C. § 3508*[11]

Plaintiff also argues that the information sought here is protected because it is supplied to the Department of the Interior by the EEOC. Plaintiff states:

"Although Executive Order 11246, as amended, and the Department of Labor regulations, supra, implementing it are silent on the question of the confidentiality of employment information submitted to the Joint Reporting Committee, the prohibition upon disclosure contained in Section 709(e) of the Civil Rights Act of 1964 extends to such information in the hands of the Department of Labor, the Department of the Interior or any other federal agency exercising OFCC authority pursuant to Executive Order 11246, as amended. 44 USC Section 3508 provides:

'(a) If information obtained in confidence by a Federal agency is released by that agency to another Federal agency, all the provisions of law including penalties which relate to the unlawful disclosure of information apply to the officers and employees of the agency to which information is released to the same extent and in the same manner as the provisions apply to the officers and employees of the agency which originally obtained the information. The officers and employees of the agency to which the information is released, in addition, shall be subject to the same provisions of law, including penalties, relating to the unlawful disclosure of information as if the information had been collected directly by that agency.'

It has been held that 'information which is confidential in the hands of one agency retains its protected character in the hands of agencies to which it is subsequently furnished.' *Grumman Aircraft Engineering Corporation v. Renegotiation Board,* [138 U.S.App.D.C. 147], 425 F.2d 578 (1970)."

The argument might prevail if the Department of Interior had obtained the information sought here from the EEOC. However, defendant obtained the information independently under Executive Order 11246, rather than by release from the EEOC.

The District Court in *Sears, supra,* said:

"Neither statute [1905 or 3508], however, 'specifically exempts' documents from disclosure. Section 3508(a) merely provides that applicable law follows documents as they travel from one agency to another. We have already decided that transfer from JRC to GSA/OFCC is not to be construed as transfer from EEOC to GSA/OFCC. Under the relevant Disclosure Rules, 41 C.F.R. § 60–40.1 et seq., disclosure of EEO–1's and AAP's by GSA/OFCC is authorized by law."

384 F.Supp. at 1003.

Plaintiff here, as did plaintiff in *Sears,* also argues that the Joint Reporting Committee, the physical recipient of the EEO–1 Form, is the agent solely of the EEOC, thus contaminating the Form and bringing 2000e–8(e) into force.

The District Court in *Sears* persuasively rejected that argument:

"Nor, for the purposes of this statute, are members of JRC 'employees' of EEOC. The OFCC could require reporting forms that differ from EEO–1's, and could route them through separate channels. That it does not do so is for reasons of convenience of both contractor and agency, rather than as a bureaucratic subterfuge. The JRC is a mere collection house that collects documents for and distributes them to the authorized agencies. To the extent that JRC collects information for OFCC pursuant to Executive Order 11246, it must be deemed an agent of OFCC, not EEOC."

384 F.Supp. at 1002.

Accordingly, the information is not exempt under 5 U.S.C. § 552(b)(3) as a result of 44 U.S.C. § 3508.

## C. *18 U.S.C. § 1905*

Finally, the plaintiff argues that § 1905 should prevent disclosure, stating:

11. *Westinghouse* did not address 44 U.S.C. § 3508.

"[T]he Defendants are also restrained from making said disclosure, upon pain of criminal sanction, by 18 U.S.C. Section 1905, which provides as follows:

'Whoever, being an officer or employee of the United States or of any department or agency thereof, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office of employment.' "

The Fourth Circuit has concluded that § 1905 does fall within the ambit of exemption 3.

"It is true that *Robertson*[12] did not identify § 1905 as a statute within the parameters of Exemption 3. But the conclusion seems inescapable that it was so considered. § 1905 certainly fitted the description of an 'extant' statute as defined by the Supreme Court in *Robertson* and it represented the type of 'general' prohibition of disclosure discussed therein."

*Westinghouse, supra,* 542 F.2d at 1202. And again:

"We accordingly think the District Court in these cases properly found that § 1905 is a statute qualifying under Exemption 3, both specifically as one of the '100 or more' statutes included therein, and by incorporation thereunder of the applicable Regulation of the Department of Labor, and could have decided the cases on that basis, as we later indicate." (Footnotes omitted).

*Westinghouse, supra,* 1203.

This court respectfully believes that the Fourth Circuit decision in *Westinghouse,* to the extent that it held that § 1905 is a statutory exemption to the FOIA contemplated by exemption (b)(3), has been overruled by the "Government In The Sunshine Act," P.L. 94–409, approved on September 13, 1976, and stated in the Act to be effective on or about March 13, 1977. This Act has not been mentioned by counsel for either party, nor was it mentioned by the Fourth Circuit in *Westinghouse,* but it appears to be determinative of the issue of the applicability of § 1905.

P.L. 94–409, as adopted, was the result of a Conference Committee Report of the House and Senate which recommended the inclusion in Senate Bill 5 of a provision of a House Bill amending exemption 3 of the FOIA. The House Government Operations Committee Report on that section of the bill expressly stated its intent to overrule the decision of the Supreme Court in *Administrator, FAA v. Robertson,* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1972), and further stated that the proposed amendment to exemption (3) " . . . would not permit the withholding of information otherwise required to be disclosed by the Freedom of Information Act . . . " based upon 18 U.S.C. § 1905. H.R.Rep. No. 880, 94th Cong., 2d Sess. Pt. 1, p. 23 (1976), U.S.Code Cong. & Admin.News 1976, p. 3687. The report continued:

" . . . if material did not come within the broad trade secrets exemption of the Freedom of Information Act, section 1905 would not justify withholding . . . ." *Id.,* U.S.Code Cong. & Admin. News 1976, p. 3687.

The report also, and most importantly, states that the decision of the Supreme

---

12. *FAA Administrator v. Robertson,* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1974).

Court in *Robertson, supra,* " . . . misconceives the intent of exemption (3) . . . " and is the reason for the amendment to exemption (3) which ultimately was made by the "Government In The Sunshine Act." H.R. Rep. No. 880, *supra.*

The Conference Report adopted the rationale and reason of the house in proposing the amendment to exemption (3). Sen. Conf.Rep. 1178, 94th Cong., 2d Sess. at 24–25 (1976).

Since the legislative history of the "Government In The Sunshine Act" unequivocally demonstrates Congressional disapproval of the interpretation of exemption (3) to the FOIA which the Supreme Court in *Robertson* and the Fourth Circuit in *Westinghouse* have made, such prior judicial interpretation may not now be relied upon by this court to determine that § 1905 is a statute falling within the ambit of exemption (3). The Congressional intent has been clearly stated to the contrary. *N.L.R.B. v. Sears, Roebuck and Company,* 421 U.S. 132, 164–65, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). Even though the "Government In The Sunshine Act" has not yet taken effect, its relevant expression of Congressional intent must be accepted at this time in any present interpretation of exemption (3). *Id.* Section 1905 of Title 18, U.S.C. does not, therefore, preclude the release of the information involved in the present case.

Since it has been conceded by the plaintiff that the information involved here does not come within exemption (4), the trade secrets exemption of the FOIA, the preliminary injunction must be dissolved, the motion of the defendant for summary judgment must be granted, and the motion of the plaintiff for summary judgment must be denied, there being no dispute of material fact.